Appellant was convicted of the offenses of burglary in the third degree (two counts); theft of property in the second degree; and attempt to commit burglary in the second degree. Pursuant to the provisions of the Alabama Habitual Felony Offender Act, the appellant was sentenced to eleven years' imprisonment for each count, with each sentence to run concurrently. From said convictions and sentences, this appeal follows. For the reasons outlined below, the convictions and sentences are due to be affirmed.
On December 7, 1984, an attempted burglary took place at the apartment of Nancy Dreaden. Also on December 7, 1984, a burglary and theft took place at Blackburn's Garage. A third burglary of the apartment of Jerome Martin occurred during the same morning.
One of the victims, Nancy Dreaden, testified that she was asleep when she heard a noise in her kitchen around 1:00 a.m. on the morning of December 7, 1984. When she went into her kitchen, glass came flying from across the room. Ms. Dreaden testified that she saw a man, whom she later identified as the appellant, standing and looking in the broken kitchen door. The victim began to scream and the appellant ran away, but not before Ms. Dreaden had observed his face and chest area for several seconds. After the appellant fled, Ms. Dreaden reported the incident to the police and gave a description of the suspect. Around 4:00 a.m. the police returned to her apartment with a suspect matching the description Ms. Dreaden had given them. She identified the suspect as the man who was trying to get into her apartment through her kitchen window. Additionally, in court Ms. Dreaden positively identified the defendant as that suspect.
Another of the crimes which occurred the same morning occurred when someone broke into Blackburn's Garage and took money from one of the drink machines. Otis Haggard testified that he observed a long-haired man, wearing blue jeans and a plaid jacket, running from the garage on the morning in question. Haggard also stated that the person he saw was carrying a box.
The third victim was Jerome Martin, who testified that someone broke through the back door of his apartment on the morning of December 7, 1984. Martin testified that the unidentified person stole a scanner, three rings, some brass candlesticks, a tool box, and a claw hammer.
Several officers with the Florence Police Department testified that on the morning of December 7, 1984, they observed a man matching the description of the burglary suspect walking down the street. This suspect was later positively identified as the defendant. When the defendant saw the police officers, he attempted to hide behind some bushes, but was apprehended by the police. The police officers transported the appellant to Ms. Dreaden's apartment, where she identified him as the person she had observed through her kitchen window. Although the police officers detected the odor of alcohol on the appellant's breath, they testified that he did not appear to be *Page 1343 
intoxicated. After the appellant was given his full Miranda
rights, he admitted attempting to break into Ms. Dreaden's residence, Blackburn's Garage, and Jerome Martin's apartment. Additionally, the appellant offered to take the police officers to the place where he had hidden the stolen property.
Prior to trial, a hearing on the appellant's motion to suppress was held. The first issue raised on appeal concerns the propriety of the trial court's denial of the motion to suppress certain statements made by the appellant at the time of his arrest. The second issue raised on appeal is: "whether the identification procedures utilized support the conviction of appellant."
 I
Appellant argues that the trial court improperly denied his motion to suppress and, for this reason, committed reversible error. Appellant contends that any statements which he made at the time of his arrest should be inadmissible as evidence because he was "intoxicated and under the influence of alcohol and drugs to the extent that he was incompetent to voluntarily give a statement." At the hearing on the motion to suppress, the appellant testified that, during the evening of December 6, 1984, he: (1) drank a "half a pint of whiskey and three or four beers"; (2) took four "blue Valiums"; and (3) took at least one "green Placidyl." Cheryl Fields testified that she observed the appellant, on the night in question, drinking whiskey and also taking Valium and Placidyl. Cynthia Abernathy testified that the appellant took "about two or three" Placidyls and "at least eight to ten" Valiums on the night of December 6, 1984. Additionally, Abernathy testified that the appellant had been drinking whiskey and "several beers."
Police officers who observed the appellant testified that they detected the smell of alcohol on the appellant's breath and noted that the appellant "appeared" to have a "bad cold." One of the officers admitted that the appellant "mentioned" that he had taken some drugs, including Placidyl and Valium. Both officers, however, testified that the appellant did not appear to be intoxicated or "under the influence."
Several recent cases from this court have discussed this precise issue. In Baker v. State, 472 So.2d 700, 702
(Ala.Cr.App. 1985), this court, per Judge Taylor, concluded that the appellant voluntarily made certain incriminating statements, notwithstanding the fact that he had been "drinking heavily, and was possibly drunk at the time he was questioned." In responding to Baker's argument that the statements should be suppressed, this court wrote the following:
 "Appellant's claim that he was so intoxicated at the time of his waiver of rights that it was not a voluntary waiver is also without merit. Alabama courts have held that `intoxication, short of mania or such impairment of the will and mind as to make an individual unconscious of the meaning of his words, will not render a statement or confession inadmissible.' Eaton v. State, 423 So.2d 352
(Ala.Cr.App. 1982), Jackson v. State, 375 So.2d 558
(Ala.Cr.App. 1979). Evidence indicated that Baker was not so drunk that his statement was involuntary." Id.
at 703.
In another recent opinion, this court, per Judge Tyson, upheld the admission of a statement into evidence which the appellant argued was involuntarily made. In Scanland v. State,473 So.2d 1182 (Ala.Cr.App. 1985), the appellant argued that his intoxication at the time of questioning by the police rendered any statements he made involuntary. In rejecting this argument, this court stated the following general rule:
 "[T]his court has held on many occasions that in order for intoxication to render a confession inadmissible, it must amount to a `mania' which impairs the will and mind to the extent that the person confessing is unconscious of the meaning of his words, [a] lesser state of intoxication will not render a confession inadmissible." (Citations omitted.) 473 So.2d at 1186-87 *Page 1344 
Here, the appellant presented no testimony that he was laboring under a "mania" which impaired his "will and mind." At the most, mere evidence of a "lesser state" of intoxication was presented to the judge, who correctly concluded that the statements could be received into evidence. Moore v. State,469 So.2d 1308, 1309 (Ala.Cr.App. 1985). As this court has noted, "the mere fact that the defendant had taken drugs sometime before he made a statement does not automatically render a confession involuntary." Byrd v. State, 421 So.2d 1344, 1348
(Ala.Cr.App. 1982), quoted in Murphy v. State, 462 So.2d 761,762 (Ala.Cr.App. 1984).
In another recent case, this court, per Judge Tyson, concluded that the appellant's statement was properly admitted into evidence notwithstanding his claim that he was "drunk" at the time he made the statement. Smith v. State, 466 So.2d 1026
(Ala.Cr.App. 1985). In determining that the admission of the appellant's statement into evidence was proper, this court noted as follows:
 "`In Palmer v. State, 401 So.2d 266, 268
(Ala.Cr.App. 1981), the court held, "[W]here ample evidence, even though conflicting, exists from which the trial judge could conclude that the appellant was not intoxicated to the extent of mania, the admission of a confession for a jury's consideration is not an abuse of discretion." In further regard to contradictory evidence at a voluntariness hearing, the court in Snider v. State, 422 So.2d 807
(Ala.Cr.App. 1982), held that when conflicting evidence is presented great weight will be given to the trial court's determination of the issue.'" (Citations omitted.) Id. at 1029.
In the present case, conflicting evidence was presented to the trier of fact for his consideration on the issue of whether the appellant's confession was voluntary. Of course, "[m]aking decisions based on disputed facts is an essential duty of trial judges." Sales v. State, 432 So.2d 560, 562 (Ala.Cr.App. 1983). Where the trial judge determines, on conflicting evidence, that a confession has been voluntarily made, such a finding will not be disturbed on appeal unless it is found to be "papabably contrary to the weight of the evidence." Todd v. State,472 So.2d 707, 714 (Ala.Cr.App. 1985); Harris v. State,420 So.2d 812, 815 (Ala.Cr.App. 1982). See also: Sumpter v. State,480 So.2d 608 (Ala.Cr.App. 1985); Myers v. State, 401 So.2d 288
(Ala.Cr.App. 1981); Balentine v. State, 339 So.2d 1063
(Ala.Cr.App.), cert. denied, 339 So.2d 1070 (Ala. 1976). Additionally, in the absence of "clear error", however, the trial court's "`credibility choices at suppression hearings are binding on this court.'" (Citations omitted.) Murphy v. State,462 So.2d 761, 762 (Ala.Cr.App. 1984), quoting United States v.Aldridge, 719 F.2d 368, 373 (11th Cir. 1983).
Testimony presented at the hearing on the motion to suppress tended to prove that the appellant was coherent and the statements which were made were voluntary. Because there was no showing that the trial court abused its discretion when it allowed the statements to be entered into evidence, the decision of the trial court is upheld. Shorts v. State,412 So.2d 830 (Ala.Cr.App. 1981).
 II
In his second issue, appellant argues that, under the authority of Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375,34 L.Ed.2d 401 (1972), he was not properly identified by the victims as the perpetrator of the crime.[1] Appellant asserts that the presentation to Ms. Dreaden of the appellant as a suspect was "unduly suggestive" under Biggers and thus a reversal of his *Page 1345 
conviction is required. In this case, however, testimony presented at trial shows that the Biggers criteria were met and the identification of the appellant was proper.
It is apparent from the testimony of Ms. Dreaden that she had ample opportunity to view the appellant and was "positive" that he was the person who had committed the crime. The following portions of the trial transcript support this conclusion: "Q [District Attorney]: All right. What did you do when you heard that noise?
 "A [Nancy Dreaden]: I went — I got up and went into the kitchen to see what had happened. I thought something had fallen. Just as I got to the kitchen door, the glass came flying from the window across the kitchen.
"Q What time was this, in your best estimate?
"A Not far from 1:00.
"Q In the morning?
"A Yes.
"Q All right. What happened then?
 "A Well, I screamed. I screamed a second time, and when the fellow looked up and saw me, he ran.
"Q Was the light on in the kitchen?
"A Yes. A bright light was on in the kitchen.
 "Q Had you turned that on when you went into the kitchen?
"A No, it stays on all the time.
"Q Was there a light on outside?
 "A Yes. Our porches go right together so my porch was lit by my neighbor's light.
"Q Over the door?
 "A Well, there's a little hallway that separates our apartments from the utility rooms, and it was that little hallway thing that she had the light on.
"Q Could you see the person at the window?
"A Yes. I saw him very well.
"Q Do you recognize the Defendant?
"A Yes. He is the person that I saw at the window.
"Q Is there any question about that?
 "A No. And then the policemen brought him back later for me to identify him. That was left out.
". . . .
"Q Had he unlocked the window?
 "A Yes. He had got the glass out of the window. There was that awful noise, and the glass went all across the kitchen. And then apparently — I didn't see him do it, but he had reached up and unlocked the window. That's when I appeared at the door. He saw me and ran.
"Q Was he looking at you when you saw him?
 "A Well, he looked at me before he ran. I don't know that he was looking at me when I first saw him.
 "Q Okay. So you got a good view of him; is that right?
"A I sure did.
"Q Do you remember what he was wearing?
"A All I remember is the plaid jacket.
"Q Is that all you could see of him?
"A Yeah. See, I just saw him from here up.
"Q From the chest up?
"A Uh-huh.
"Q Did he say anything to you?
"A No. And when I screamed, he ran.
"Q What did you do after that?
"A I called the police.
 "Q And you say that they brought him back to your residence?
"A Yes. . . .
". . . .
 "Q Did you see the police officer later on that morning?
"A They came back later and brought him.
 "Q How much later was it that they came back and brought him?
 "A Not being positive, but it was near 4:00. It had been a long night, but it was around 4:00.
"Q What was he wearing when you saw him?
"A All I remember for sure was the plaid jacket. *Page 1346 
"Q Did he say anything to you at that time.
"A He never said a word to me.
"Q Did you identify him to the police officers?
"A I did."
In addition to the above testimony which was elicited on direct examination, Ms. Dreaden also testified on cross-examination that she was positive of her identification. In particular, she stated that she "got a full look at [the appellant's] face"; that she was able to "look right at his face"; and that she "recognized him for sure" when the police officers brought him to her home later in the morning. Ms. Dreaden also testified as follows on cross-examination:
 "Q [Defense counsel]: Ma'am, what I'm trying to get to is that it's important that you be positive with your identification.
 "A [Ms. Dreaden]: I am positive that the man who stood in my living room was the man whose face I saw so closely in my kitchen window.
"Q How are you positive about that?
"A I have good sense.
"Q Do you have good eyesight?
"A Yes.
"Q You can see perfectly well?
"A Yes.
 "Q And you say that the Defendant is the same person that you saw in your living room?
"A Yes."
Based on the above, it is apparent that there was positive proof of the appellant as the perpetrator of the crime by way of the in-court as well as the out-of-court identification of the appellant.
Appellant maintains, however, that he was subjected to an impermissibly suggestive pre-trial identification when the police officers returned him to Ms. Dreaden's apartment within a short period of time. In the recent case of Cooley v. State,439 So.2d 193, 195 (Ala.Cr.App. 1983), however, this court held that "the mere fact that the appellant was subjected to a one-man showup does not necessarily render that identification procedure impermissively suggestive." (Emphasis in original.) In reaching this conclusion, this court in Cooley reasoned as follows:
 "`Whether an out-of-court identification procedure has violated due process depends upon the "totality of the circumstances." [Citations omitted.] This totality of the circumstances test is the standard in deciding whether an identification procedure is unnecessarily suggestive and conducive to irreparable mistaken identification.'" (Citation omitted.) Id.
at 195, quoting Brazell v. State, 369 So.2d 25
(Ala.Cr.App. 1978).
Here, under the "totality of the circumstances," it is apparent that the victim made an extremely reliable identification of the appellant as the person who had committed the crime.
Additionally, "it is settled law that prompt, on-the-scene confrontations are not constitutionally impermissible, but are consistent with good police work." (Citations omitted.) Hobbsv. State, 401 So.2d 276, 279 (Ala.Cr.App. 1981). A prompt on-the-scene identification of a suspect increases the reliability of the identification under the following rationale:
 "`[T]he police action in returning the suspect to the vicinity of the crime for immediate identification in circumstances such as these fosters the desirable objectives of fresh, accurate identification which in some instances may lead to the immediate release of an innocent suspect and at the same time enable the police to resume the search for the fleeing culprit while the trail is fresh." Id. at 280, quoting Bates v. United States, 405 F.2d 1104 (D.C. Cir. 1968).
Under the facts presented by Ms. Dreaden's testimony, all five of the Biggers factors were established. That is, Ms. Dreaden testified that she had the opportunity to observe the appellant at the time of the crime; that she was alert and observed the appellant; that she was subsequently able to describe the appellant; and that she was certain of the identity of the appellant when the police brought him to her later that evening. After considering these *Page 1347 
factors, we conclude, as this court in Glass v. State,424 So.2d 687, 690 (Ala.Cr.App. 1982), concluded, that the identification of the appellant as the person who had committed the crime was "highly reliable." In the present case, the pretrial confrontation was not so "impermissibly suggestive" that it created a "substantial risk of misidentification," and thus the identification was proper. Jackson v. State,414 So.2d 1014, 1018 (Ala.Cr.App. 1982).
Additionally, the witness positively identified the appellant in open court. This in-court identification would be proper under the following general rule:
 "If, despite the violation of due process standards, the prosecution can establish by clear and convincing evidence that the in-court identification testimony, rather than stemming from the unfair pretrial confrontation, has an independent source, the in-court testimony need not be excluded." (Citation omitted.) Brazell v. State, 369 So.2d 25, 29 (Ala.Cr.App. 1978), cert. denied, 369 So.2d 31
(Ala. 1979).
No due process violation occurred as a result and the in-court identification of the appellant was not thereby tainted. Tatev. State, 417 So.2d 608, 609 (Ala.Cr.App. 1982). See also;Matthews v. State, 401 So.2d 241 (Ala.Cr.App.), cert. denied,401 So.2d 248 (Ala. 1981).
Even the fact that the victim may have been "distraught" would not be dispositive of this issue. As this court, per the Honorable Leigh M. Clark, retired circuit judge, noted:
 "This [the fact that the victim was distraught at the time of the showup] is a circumstance to be considered, but it is not enough to outweigh the other circumstances in favor of the admissibility of the in-court identification, especially in the circumstance of a positive identification by the victim, the absence of any motive on her part to accuse the particular defendant, her corroborated testimony as to his clothing and description and an adequate opportunity to observe him so that she could identify him thereafter." King v. State, 395 So.2d 489, 491 (Ala.Cr.App. 1981).
Thus, the identification was proper, and this issue is decided adversely to the appellant.
AFFIRMED.
All the Judges concur.
[1] In Biggers, the United States Supreme Court noted that the following factors should be considered in evaluating the likelihood of a "misidentification":
 "(1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation." Id. at 93 S.Ct. 382.